Filed 3/17/21

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CITY OF TORRANCE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SOUTHERN CALIFORNIA<br>EDISON COMPANY,<br><br>    Defendant and Respondent. | B300296<br><br>Los Angeles County<br>Super. Ct. No.<br>19STCV10249 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Reversed and remanded with directions.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, John L. Jones II, Jin Soo Lee, Matthew C. Slentz; Patrick Q. Sullivan and Tatia Y. Strader for Plaintiff and Appellant.

Steptoe & Johnson, Laurie Edelstein, P. Casey Matthews; Patricia Cirucci, Lisa DeLorme and Mark Rothenberg for Defendant and Respondent.

# INTRODUCTION

Southern California Edison Company (Edison) is the exclusive provider of electricity to residents and businesses located in the City of Torrance (Torrance). Pursuant to section 225.1.4 of the Torrance Municipal Code[1] (electricity tax ordinance), consumers of electricity must pay Torrance a tax on the charges for electricity and ancillary services they use (electricity users' tax). Edison is required to collect this tax from consumers and remit it to Torrance.

Torrance filed this lawsuit against Edison after it discovered that Edison had calculated the electricity users' tax as a percentage of the net amount Edison was billing its consumers, i.e., the charges for electricity and other services less an annual credit (the IA credit) relating to state-wide greenhouse gas emissions policy.[2] Torrance, however, contends that the electricity tax ordinance does not permit Edison to apply the IA credit to reduce electricity consumers' tax base, thereby reducing Torrance's tax revenue. Torrance's complaint seeks declaratory relief concerning the interpretation and application of the electricity tax ordinance and asserts that Edison failed to comply with the ordinance by not collecting the proper amount of electricity users' tax from consumers. Torrance also seeks to

---

[1] All undesignated statutory references are to the Torrance Municipal Code, available at <https://www.codepublishing.com/CA/Torrance/> [as of Mar. 8, 2021], archived at <https://perma.cc/K3Q8-LYQA>.

[2] The California Public Utilities Commission (Commission) determines the amount of the IA credit. For purposes of administrative convenience, Edison disburses the IA credit as a credit on an electricity consumer's bill, as directed by the Commission.

recover the unpaid taxes, together with penalties and interest, from Edison.

The trial court sustained Edison's demurrer to Torrance's original complaint without leave to amend and entered a judgment of dismissal. The court found Edison had calculated the electricity users' tax properly and, in addition, Torrance's claim to recover unpaid taxes from Edison (as opposed to electricity consumers) failed as a matter of law. We agree with Torrance that the electricity tax ordinance cannot reasonably be construed in the manner proposed by Edison and adopted by the court. We agree with Edison, however, that Torrance cannot recover unpaid taxes from Edison and must instead amend its complaint to include electricity consumers as defendants. Accordingly, we reverse and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND[3]

### 1. The Electricity Users' Tax

Torrance, a charter city, imposes a number of utility-related taxes on its residents including taxes on telephone communication services, natural gas, water, cable television, and electricity. The electricity tax ordinance provides:

"a) There is hereby imposed a tax upon every person in the City using electrical energy in the City. The tax imposed by this Section shall be at the rate of six (6) percent of the charges made for such energy; provided, however, that effective July 1, 1991, the tax imposed by this Section shall be at the rate of six and

---

[3] Consistent with the standard of review, we accept as true all facts alleged in the operative complaint.

3

one-half (6½) percent of the charges made for such energy by an electrical corporation franchised to serve the City and shall be paid by the person using such services. The tax applicable to electrical energy provided by a nonutility supplier shall be determined by applying the tax rate to the equivalent charges the service user would have incurred if the energy used had been provided by the electrical corporation franchised by the City. Nonutility suppliers shall install and maintain an appropriate utility-type metering system which will enable compliance with this Section. Charges as used in this Section shall include charges made for 1) metered energy, and 2) minimum charges for service, including customer charges, service charges, demand charges, standby charges and annual and monthly charges.

"b) As used in this Section, the term 'using electrical energy' shall not be construed to apply to the storage of such energy in a battery, or the use thereof in a motor vehicle or other device apart from the premises where the battery was charged; nor shall the term include the mere receiving of such energy by an electric public utility or governmental agency at a point within the City for resale.

"c) There shall be excluded from the base on which the tax imposed in this Section is computed, charges made for electricity used in the production or distribution of water.

"d) There shall be excluded from any tax imposed in this Section, an amount equal to the amount of any Utility User's Tax paid by the nonutility supplier for natural gas used as fuel in the production of electricity.

"e) The tax imposed in this Section shall be collected from the service user by the person supplying such energy. The tax shall be self-imposed by nonutility suppliers as to their own use.

The amount of tax collected or self-imposed in one (1) month shall be remitted to the Director on or before the 20th day of the following month."

Edison is the investor-owned utility serving electricity consumers in Torrance under a grant of franchise. As such, it is required to collect the electricity users' tax and remit all amounts collected to Torrance. (§ 225.1.4, subd. (e).)

## 2. The Industry Assistance Credit

In September 2006, the Legislature adopted the Global Warming Solutions Act of 2006 ("Act"), now codified at Health and Safety Code section 38500 et seq. To implement the Legislature's stated goal of reducing statewide greenhouse gas emissions, the California Air Resources Board has developed a variety of programs including the Greenhouse Gas Cap-and-Trade program—a regulated marketplace in which greenhouse gas allowances (permits to emit an allotted amount of greenhouse gases) are allocated, sold, and traded. (Health & Saf. Code, § 38501; Cal. Code Regs., tit. 17, § 95801 et seq.)

The Commission has developed financial assistance programs for certain electric utility customers affected by the cap-and-trade program. One of these, the IA credit, is an annual credit designed to incentivize and reward businesses that implement energy-efficient programs that reduce greenhouse gas emissions. The Commission determines on an annual basis which businesses receive an IA credit as well as the amount of the credit. For administrative convenience, the IA credit is passed through investor-owned utilities, including Edison, and applied as a credit against consumers' electricity bills. (See Cal. P.U.C., Decision No. 14-12-037 (Dec. 18, 2014): Decision Adopting Greenhouse Gas Allowance Revenue Allocation Formulas and

5

Distribution Methodologies for Emissions-Intensive and Trade-Exposed Customers available at <https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M144/K130/144130487.pdf> [as of Mar. 8, 2021], archived at <https://perma.cc/TJ2M-K7DR> [pp. 66, 101].)

### 3. Dispute Over Edison's Electricity Users' Tax Calculation

Torrance and Edison disagree about the method Edison should use to calculate the electricity users' tax. Specifically, they disagree regarding the proper tax base.[4]

Torrance contends the tax base is equal to the total charge for a user's metered electricity and other services listed in section 225.1.4, subd. (a). Under Torrance's view, a user's IA credit, if any, would not affect the tax base because it is unrelated to the charge for the electricity used by the consumer.

Edison contends the tax base is equal to the net amount it bills electricity consumers. Edison has calculated the tax base by subtracting the IA credit from the total charge for a consumer's metered electricity and other services listed in section 225.1.4, subd. (a). Under Edison's methodology, the consumer's electricity users' tax base (and, ultimately, the amount of the tax) will necessarily be reduced whenever a consumer receives an IA credit.

A simple example illustrates the point. Assume a consumer incurs a $100 charge for metered electricity and other services

---

[4] The "tax base" is "[t]he measure where the assessment or the determination of a tax liability is based." (Black's Law Dict. (11th ed. 2019).)

and receives a $20 IA credit. Torrance would use the charged amount of $100 as the tax base and calculate the electricity tax as $6.50 (6½ percent of $100). Edison would calculate the total bill first ($100 charge less the $20 IA credit = $80 bill) and use the $80 billed amount as the tax base to calculate the electricity tax as $5.20 (6½ percent of $80).

### 4. Torrance's Complaint

In March 2019, Torrance filed its original, and only, complaint containing two causes of action styled as a request for declaratory relief and a request for an order compelling Edison to comply with the electricity tax ordinance. Torrance alleged Edison failed to remit the full amount of tax owed to Torrance under the electricity tax ordinance, noting Edison was required to collect and then remit a tax on "charges" for metered energy, customer charges, services charges, demand charges, and other charges identified in the electricity tax ordinance. Torrance claimed Edison was directly liable for the underpayment of the electricity tax.

In its prayer for relief, Torrance sought a declaration that the electricity tax base is equivalent to the charges made for metered energy and other services listed in the electricity tax ordinance, "with no reduction for credits that may be provided for by the Commission, or otherwise[.]" With respect to the second cause of action, Torrance asked the court to compel Edison to apply the electricity users' tax to the tax base as noted above and, further, to compel Edison to account for and pay the amounts it failed to collect by using the incorrect tax base in prior years. As to both causes of action, Torrance sought penalties and interest on the outstanding electricity users' taxes owed to Torrance as well as costs of suit.

**5.     Edison's Demurrer**

Edison demurred to the complaint, asserting that both of Torrance's claims failed to state facts sufficient to constitute a cause of action and sought relief in violation of the California Constitution. First, Edison noted that Torrance sought to recover what it called "under-collected taxes," i.e., the difference between the tax Edison collected and remitted to Torrance and the higher amount of tax owed by electricity consumers under Torrance's methodology. Edison asserted that Torrance could not recover any unpaid electricity users' tax directly from Edison because, under section 255.1.14, the electricity tax is a debt owed to Torrance by electricity consumers—not by Edison directly. Accordingly, Edison claimed, Torrance could only sue electricity consumers to recover the unpaid taxes. Edison argued on the same basis that Torrance could only recover penalties and interest on the unpaid taxes, if at all, from electricity consumers and not directly from Edison.

Alternatively, Edison urged that Torrance could not state a valid claim because Edison had properly interpreted the electricity tax ordinance and had thus collected all the taxes owed to Torrance. Noting that the ordinance applies to "charges made" to electricity consumers, Edison asserted that "charges made" for electricity "are the charges that are actually billed to the customer and for which the customer incurs liability." In other words, according to Edison, the IA credit should be applied before calculating the electricity users' tax.

In addition, Edison asserted that Torrance's interpretation of the electricity tax ordinance would effectively require the court to rewrite the provision, thereby imposing an additional tax upon electricity consumers without voter approval. Such an action

8

would, Edison noted, be in violation of the California Constitution.[5] (Cal. Const., art. XIIIC, § 2, subds. (a), (b) & (d).)

Finally, Edison asserted that the court should deny Torrance the opportunity to amend its complaint because such amendment would be futile.[6]

## 6. Torrance's Opposition to the Demurrer

Torrance opposed Edison's demurrer on several grounds. By way of background, Torrance explained that IA credits are essentially rebates (a proportionate share of revenue generated in the cap-and-trade marketplace) distributed to certain electricity consumers by investor-owned utilities such as Edison. The IA credits are generally passed through Edison to qualified consumers as a credit against a consumer's electricity bill.[7]

Torrance claimed the electricity tax ordinance authorized it to recover unpaid electricity users' taxes directly from Edison. Otherwise, Torrance argued, it would have no meaningful way to enforce the electricity tax ordinance. In any event, Torrance asserted, the ordinance authorized Torrance to sue Edison to

---

[5] In light of our holding, we need not address Edison's contention on appeal that Torrance's attempt to rewrite the electricity tax ordinance is unconstitutional.

[6] Edison submitted a request for judicial notice in support of its demurrer that attached Chapter 25, Division 2 of the Torrance Municipal Code, Torrance Ordinance No. 3705, a tariff filed with the Commission by Edison, and final official election returns from the June 3, 2008 primary election. No ruling on the request is contained in the appellate record.

[7] As noted, an IA credit relates to greenhouse gas emissions policy, not the consumer's electricity consumption.

recover any and all taxes not *remitted* by Edison—not, as Edison claimed, taxes *collected* but not remitted by Edison.

Torrance also argued that Edison's interpretation of the electricity tax ordinance conflicted with the ordinance's plain language. Specifically, the ordinance applies the electricity users' tax to "charges made for such [electrical] energy" not, as Edison would have it, charges minus any credits to which the user might be entitled.

Finally, Torrance dismissed Edison's constitutional argument, stating that it wanted only what the electricity tax ordinance already provided—not more.[8]

In reply, Edison reiterated its prior arguments.[9]

---

[8] Torrance submitted a request for judicial notice in support of its opposition to Edison's demurrer. Torrance asked the court to judicially notice a decision of the Commission dated December 18, 2014, the "Amended Joint Investor-Owned Utility Cap-and-Trade Greenhouse Gas Revenue Allowance Return Implementation Plan" and a related proof of service, a staff report for the Torrance City Counsel, the California Local Government Finance Almanac (2017 ed.) Utility User Tax Facts by Michael Coleman, an excerpt from the Commission's Order Instituting Rulemaking 11-03-012 and a related proof of service, an Advice Letter filed with the Commission by Edison, and the Schedule EITE filed with the Commission by Edison. No ruling on the request is contained in the appellate record.

[9] Edison submitted a supplemental request for judicial notice in support of its reply brief. Edison sought notice of six documents issued by the Commission and a page from the website of South Bay Cities Council of Governments. No ruling on the request is contained in the appellate record.

**7.      The Court's Ruling; Appeal**

The court sustained Edison's demurrer without leave to amend for the reasons stated in Edison's moving papers.[10] As to Torrance's second cause of action for failure to comply with the electricity tax ordinance, the court agreed with Edison that the ordinance does not give Torrance the authority to recover uncollected taxes and associated penalties directly from Edison. Instead, the court found, Torrance was required by the plain language of the electricity tax ordinance to recover any unpaid taxes directly from electricity consumers.

The court also agreed with Edison's interpretation of the electricity tax ordinance, finding that Edison properly applied the electricity tax to the net amount billed to consumers after application of the IA credit. The court stated that Torrance "does not and cannot point to any language in the [electricity tax ordinance] requiring Edison to calculate the [electricity tax] on gross costs without a reduction for credits." In addition, the court adopted Edison's view that " '[c]harges made' are those charges billed to the customers and for which they are responsible. Gross electric costs, which are not billed to the customer, are not 'charges made' and are not amounts for which they incur liability." Finally, the court noted that the utility users' tax ordinances applicable to other utilities, such as gas and telephone communications service, explicitly stated that the tax base should include the value of any credits applied, whereas the electricity

---

[10] With the exception of the utility tax ordinances, the court's ruling does not refer to any of the exhibits submitted to the court in connection with the parties' three requests for judicial notice.

11

tax ordinance did not. The court inferred that the omission must have been intentional in the electricity tax ordinance. Accordingly, the court sustained Edison's demurrer to the second cause of action.

As to Torrance's request for declaratory relief, the court found that request " 'wholly derivative' of its statutory claim" and therefore sustained Edison's demurrer to the declaratory relief claim. The court immediately signed and entered a judgment of dismissal.

This timely appeal followed.

## DISCUSSION

We consider two issues in this appeal. First, we evaluate whether Torrance's electricity users' tax base should be reduced by the value of IA credits distributed by Edison on behalf of the State. We conclude the tax base is not affected by the value of IA credits. Second, because those electricity consumers that received IA credits in the past may not have paid the full amount of tax owed under section 225.1.4, we consider Torrance's remedy. We agree with Edison that electricity consumers are liable to Torrance with respect to the taxes owed but not collected by Edison in the past. Torrance should therefore be allowed to amend its complaint to include as defendants the electricity consumers at issue.[11]

---

[11] We deny the parties' requests for judicial notice filed June 5, 2020, June 25, 2020, August 21, 2020, and February 4, 2021.

### 1. Standard of Review

We independently review a trial court's order sustaining a demurrer to determine whether the operative complaint alleges facts sufficient to state a cause of action. (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 725.) We assume the truth of all properly-pled factual allegations and matters that are judicially noticeable. (*Ibid.*) We also liberally construe the complaint's allegations with a view toward substantial justice. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 43, fn. 7.) But where facts appearing in attached exhibits or judicially noticed documents contradict, or are inconsistent with, the complaint's allegations, we must rely on the facts in the exhibits and judicially noticed documents. (*Ivanoff*, at p. 726.)

When a demurrer is sustained without leave to amend, we decide whether there is a reasonable possibility that the plaintiff can amend its complaint to cure the defect. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) If the defect can be cured, "the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Ibid.*) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid.*) Such a showing can be made for the first time on appeal. (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 711.)

### 2. The IA credit does not affect the calculation of Torrance's electricity users' tax base.

We begin by determining the proper methodology to calculate an electricity consumer's tax under section 225.1.4 and, more specifically, whether an electricity consumer that receives

an IA credit is entitled to a tax base reduction equal to the amount of the credit.

### 2.1. **Legal Framework**

Statutory interpretation is an issue of law, which we review de novo. (E.g., *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183.) " 'Our primary task in construing a statute is to determine the Legislature's intent.' (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 (*Jarrow Formulas*).) ' "Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context." [Citation.]' (*Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 1000 (*Ramirez*).) ' " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to [extrinsic] indicia of the intent of the Legislature ... .' " [Citation.]' (*Jarrow Formulas,* at p. 735.)" (*Chinese Theatres, LLC v. County of Los Angeles* (2020) 59 Cal.App.5th 484, 491.) Where the language of the statute is potentially ambiguous, " '[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.' [Citation.]" (*People v. Manzo* (2012) 53 Cal.4th 880, 886; *People v. Alaybue* (2020) 51 Cal.App.5th 207, 222.)

"The 'plain meaning' rule, however, 'does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word

14

or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible.' [Citations.]" (*City of Redondo Beach v. Padilla* (2020) 46 Cal.App.5th 902, 911–912.)

### 2.2. **The Plain Language of Section 225.1.4**

The present dispute focuses mainly on the meaning of the word "charge" as it is used in the electricity tax ordinance and, specifically, whether "charge" refers to the cost of electricity consumed and services rendered or, as Edison claims, the net amount Edison bills its electricity consumers after subtracting the IA credit.

"Charge" generally has a broad meaning. (See *Webb v. City of Riverside* (2018) 23 Cal.App.5th 244, 252 ["The plain, commonsense meanings of the terms 'rate' and 'charge' are broad, encompassing a price or cost sought."].) "Charge," as relevant here, may also be defined as "the price demanded for something." (Merriam-Websters Collegiate Dict. (11th ed. 2003) p. 208; and see *Webb*, at p. 252 [referencing Webster's Third New International Dictionary's definition of "charge" as "the price demanded for a thing or service"].)

Section 225.1.4 uses "charge" in this manner. As noted, subdivision (a) defines the electricity users' tax base in broad terms, imposing a tax "upon every person in the City using electrical energy in the City." The tax is imposed on "the charges made for such energy," and it is evident that "such energy" refers to the quantity of electricity used. Using the general definition of "charge" and applying it to the first sentence of subdivision (a) suggests that Torrance intended to impose a tax on the cost of electricity used by its residents.

15

We need not speculate about what Torrance intended when it enacted section 225.1.4, however, because subdivision (a) of the ordinance explicitly defines what "charges" means: "Charges as used in this Section shall include charges made for 1) metered energy, and 2) minimum charges for service, including customer charges, service charges, demand charges, standby charges and annual and monthly charges." This definition makes sense, and it comports with the general definition and usage of "charge" we have set forth. And although subdivision (a) does not use the phrase "tax base," that is the effect of the subdivision. Subdivision (a), according to its plain meaning, provides that the electricity users' tax base includes both the cost of electricity consumed and the cost of ancillary services relating to the delivery of electricity service.

The broad definition of the tax base contained in section 225.1.4, subdivision (a) is limited by subdivisions (b), (c), and (d), which set forth the exclusions from the tax base. Subdivision (b) reduces an electricity consumer's tax base by providing that "the term 'using electrical energy' shall not be construed to apply to the storage of such energy in a battery, or the use thereof in a motor vehicle or other device apart from the premises where the battery was charged; nor shall the term include the mere receiving of such energy by an electric public utility or governmental agency at a point within the City for resale." Subdivisions (c) and (d) expressly reduce a consumer's electricity tax base and tax, respectively. Subdivision (c) "exclude[s] from the base on which the tax imposed in this Section is computed, charges made for electricity used in the production or distribution of water," and subdivision (d) "exclude[s] from any tax imposed in this Section, an amount equal to the amount of any Utility User's

16

Tax paid by the nonutility supplier for natural gas used as fuel in the production of electricity."

In sum, applying the plain and commonsense meaning of the words of the electricity tax ordinance leads us to conclude that unless one of the three narrowly-drawn exceptions applies, Torrance's electricity users' tax is imposed on the amount Edison charges for electricity consumed and any ancillary services it provides. Under this construction, the IA credit does not affect the electricity users' tax base.

Generally, if a statute's or an ordinance's language is unambiguous, we will presume the Legislature or City Council meant what it said, and the plain meaning of the statute or ordinance will prevail unless its literal meaning would result in absurd consequences that the enacting body did not intend. (See *Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381.) Here, the plain language of section 225.1.4 is consistent with the general understanding that a utility users' tax is consumption-based. (See, e.g., Rev. & Tax. Code, §§ 7284.2 [authorizing counties to "levy a utility user tax on the consumption of electricity" and other utilities in unincorporated areas], 7284.3 [creating exemptions to any local jurisdiction's "utility user tax on the consumption of electricity"].) Nor does Edison complain that this straightforward application of the electricity tax ordinance produces absurd results.

We also note that the electricity tax ordinance does not directly conflict with the environmental policy concerns giving rise to the IA credit. Furthermore, there is no indication that the Legislature intended for the Global Warming Solutions Act of 2006 to impact local utility users' taxes. (See Stats. 2006, ch. 488 (A.B. 32).) The Legislature has created other exemptions from

17

local jurisdiction taxes. (See, e.g., Rev. & Tax. Code, § 7284.1 [exempting religious leaders and nonprofit organizations from local license taxes].) And, in furtherance of environmental policy goals encouraging the use of clean energy, the Legislature exempted the use of compressed natural gas to charge electric public transit vehicles from local utility users' taxes. (Rev. & Tax. Code, § 7284.3, added by Stats. 2012, ch. 213, § 3 (S.B. 1257).) The Legislature did not take a similar approach, however, in adopting the Act. (See Stats. 2006, ch. 488 (A.B. 32).) We therefore presume the Legislature did not intend for methods used to encourage the reduction of greenhouse gas emissions adopted pursuant to the Act, such as the issuance of IA credits by the Commission, to reduce Torrance's electricity users' tax base.

### 2.3. Edison's arguments are unpersuasive.

Although Edison contends the electricity tax ordinance is unambiguous, it construes the ordinance in a manner that reduces the electricity users' tax base by the amount of any IA credit received by its customers. Although we do not hold that section 225.1.4 is ambiguous, we will look to some extrinsic aids as needed to assist in our analysis of Edison's arguments.

Without engaging in any substantive analysis, Edison contends that "charges made," as used in the electricity tax ordinance, equates to the net amount Edison bills to an electricity consumer in a given month, taking into account all customary charges for electricity consumed and services provided, which charges are then reduced by the amount of any credit Edison might apply, such as the IA credit. Edison claims, for example, that section 225.1.4 "makes clear that the 'charges made' are the charges actually billed to the customer and for which the customer incurs liability." (Italics omitted.) " 'Charges made' thus

18

are those charges that ultimately are billed to customers and for which they are responsible—that is, the charges made and billed after the application of the IA Credit. As the trial court ruled: 'Gross electric costs, which are not billed to the customer, are not "charges made" and are not amounts for which they incur liability.' "

Notably, Edison cites nothing—aside from the court's order, to which we do not defer—in support of its assertion that the term "charges made" is equivalent to the net amount billed to an electricity user by Edison. Edison ignores the structure of the ordinance, which, as we have explained, defines the electricity users' tax base broadly in subdivision (a) and then lists three narrow exclusions from the tax base in subdivisions (b), (c), and (d). Instead, Edison notes that the electricity tax ordinance provides that "[t]he tax applicable to electrical energy provided by a nonutility supplier shall be determined by applying the tax rate to the equivalent charges the service user would have incurred if the energy used had been provided by the electrical corporation franchised by the City." Edison insists that the "term 'incurred' assumes a liability for the charge has attached" and " [c]harges made' thus are those charges that ultimately are billed to customers and for which they are responsible—that is, the charges made and billed after the application of the IA Credit." We reject Edison's construction of the statute in this manner because the very next sentence in subdivision (a) states: "Nonutility suppliers shall install and maintain an appropriate utility-type metering system which will enable compliance with this Section." The purpose of meter installation is to measure electricity consumption—i.e., the critical information necessary to calculate the user's tax base.

19

Edison also asserts that "Torrance 'does not and cannot point to any language in the [electricity tax] Ordinance requiring Edison to calculate the [tax] on gross costs without a reduction for credits." Although Edison is correct that the statute does not contain specific language to that effect, it does not need to. "Under the familiar rule of construction, *expressio unius est exclusio alterius*, where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed. [Citations.]" (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195; *Krupnick v. Duke Energy Morro Bay* (2004) 115 Cal.App.4th 1026, 1029–1030.) As we have explained, section 225.1.4 contains a broad definition of the tax base followed by three—and only three—limited exclusions, none of which can be read to include the IA credit. We will not presume, as Edison urges, that the value of IA credits should also be excluded from the electricity users' tax base. As Edison notes, we have "no power to rewrite an ordinance or statute so as to make it conform to a presumed intention which is not expressed." (*County of Madera v. Superior Court* (1974) 39 Cal.App.3d 665, 668.)

Edison also references one of the canons of statutory construction—namely, that a legislature's use of "different language in statutory provisions addressing the same subject" means that provisions with different language should have different meanings. (E.g., *People v. Trevino* (2001) 26 Cal.4th 237, 242; *Rutgard v. City of Los Angeles* (2020) 52 Cal.App.5th 815, 827.) Citing this canon, Edison notes that Torrance's utility users' tax ordinances relating to natural gas and telephone service specifically state that "charges" subject to taxation "include the value of … credits." (§§ 225.1.3(d), 225.1.5(a).) But as we have said, it was not necessary for Torrance to change the statute to

20

include the value of credits because the broad definition already, if impliedly, includes them. Moreover, "the canons of statutory construction are merely ' "guides to help courts determine likely legislative intent." ' (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017.)" (*Rutgard*, at pp. 827–828.) And where, as here, the statutory language is clear, canons of construction cannot be used to undermine it. (*Ibid.*)

## 3.     Edison is not directly liable for uncollected electricity users' taxes.

Torrance's original complaint sought to hold Edison directly liable for taxes it failed to collect from electricity consumers, as well as penalties and interest. We agree with the court's conclusion that uncollected electricity users' taxes constitute a debt owed to Torrance by electricity consumers for which Edison may not be held directly liable.

Initially, we note that Edison does not challenge Torrance's authority to require it to collect the electricity users' tax. Nor could it. It is well established, as the Supreme Court recently observed, that " '[t]he field of taxation is replete with examples of a government entity making businesses generally its agent in tax collections and prescribing certain regulations in the accounting therefor ... such as withholding taxes and social security taxes for the United States government, unemployment taxes and numerous excise taxes for the state— "a familiar and sanctioned device." ' (*Ainsworth v. Bryant* (1949) 34 Cal.2d 465, 477.) When a governmental entity lays a tax on a particular type of transaction, it often tasks one party to the transaction with the duty to see the tax is paid. Without such arrangements, a great many valid tax laws … would simply go unenforced. (*Ibid.*)" (*City*

*and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 551–552.)

Edison objects, however, to Torrance's initial assertion that Edison is directly liable to Torrance for taxes it fails to collect from electricity consumers due to, as relevant here, an erroneous construction of section 225.1.4. For example, in its prayer for relief, Torrance seeks an order "requiring Edison to account for and remit all previously underpaid Electricity Taxes owed the City" as well as "all penalties and interest" on those amounts. It appears that Torrance concedes the point, as it now asserts that it "does not seek to make [Edison] into a guarantor. Nor does it demand[ ] [Edison] pay the tax from its own funds (except to the extent it has wrongfully withheld taxes actually collected)." In order to avoid any uncertainty, however, we briefly address Edison's concern.

Edison characterizes itself as a "pass-through" with respect to Torrance's electricity users' tax. We agree. Under Public Utilities Code section 799, for example, a utility company such as Edison is viewed as a pass-through in that the statute immunizes the utility company from liability to consumers for collecting taxes that may ultimately be determined to be unlawful.[12] It

---

[12] Public Utilities Code section 799 provides, in pertinent part, "(a) With respect to all taxes enacted by any local jurisdiction, including any city, county, or city and county, including a chartered city or county, any district, including an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries, or any public or municipal corporation, and imposed on the customers of public utilities or other service suppliers, which taxes have been collected by the public utilities and other service suppliers and

makes sense that the opposite would also be true, i.e., that Edison is not liable to Torrance with respect to an electricity consumer's failure to pay taxes owed.

Section 225.1.14 of the Torrance Municipal Code confirms that proposition. Section 225.1.14 provides that "[a]ny tax required to be paid by a service user under the provisions of this Chapter shall be deemed a debt owed by the service user to the City. Any such tax collected from a service user which has not

---

remitted to the local jurisdiction all of the following shall apply: [¶] (1) The public utility or other service supplier shall have no duty to independently investigate or inquire with the local jurisdiction concerning the validity of the tax ordinance. [¶] (2) In connection with any actions or claims relating to or arising from the invalidity of the tax ordinance, in whole or in part, the public utility or other service supplier shall not be liable to any customer as a consequence of collecting the tax. [¶] (3) In the event a local jurisdiction is ordered to refund the tax, it shall be the sole responsibility of the local jurisdiction to refund the tax. Unless a public utility or other service supplier is reimbursed by the local jurisdiction for the actual cost of assisting the local jurisdiction, including, but not limited to, calculating or verifying refunds, distributing refunds, providing data, or providing data processing assistance, the public utility or other service supplier shall not be required to assist the local jurisdiction to refund the tax, including, but not limited to, calculating or verifying refunds, distributing refunds, providing data, or providing data processing assistance. [¶] (4) In any action seeking to enjoin collection of taxes imposed on customers of utilities or other service suppliers and collected by the utilities or other service suppliers, in any action seeking declaratory relief concerning the taxes, in any action seeking a refund of the taxes, or in any action seeking otherwise to invalidate the taxes, the sole necessary party defendant in the action shall be the local jurisdiction on whose behalf the taxes are collected and the public utility or other service supplier collecting the taxes shall not be named as a party in the action."

been remitted to the Director shall be deemed a debt owed to the City by the person required to collect and remit. Any person owing money to the City under the provisions of this Chapter shall be liable to an action brought in the name of the City for the recovery of such amount." Therefore, if Edison collects a tax from its consumers, it must remit the tax to Torrance and is liable to Torrance if it fails to do so. But because the tax is imposed on the utility consumer, not the utility provider, Edison is not liable to Torrance for taxes that have not been paid by its consumers.[13] The other Municipal Code provisions cited by Torrance do not undermine this basic precept and we need not examine them in detail.

### 4.    Torrance must be given leave to amend its complaint.

It is often said that leave to amend a complaint should be liberally granted, particularly with respect to a party's initial complaint. "The policy favoring amendment is so strong that it is a rare case in which denial of leave to amend can be justified." (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1428.) " 'Where [a] complaint is defective, "[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an

---

[13] We do not consider whether Edison may be compelled to assist Torrance in collecting any taxes owed by electricity consumers but not billed and collected as a result of Edison's incorrect tax calculations. Our opinion, however, should not be interpreted as preventing Torrance from obtaining prospective equitable relief against Edison. (See *City of Modesto v. Modesto Irrigation Dist.* (1973) 34 Cal.App.3d 504, 508 ["It is basic that the power to tax carries with it the corollary power to use reasonable means to effect its collection; otherwise, the power to impose a tax is meaningless."].)

abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment." ' " (*Aubry v. Tri-City Hospital Dist*. (1992) 2 Cal.4th 962, 970–971.) " 'If there is any reasonable possibility that plaintiff can state a good cause of action, it is error and an abuse of discretion to sustain the demurrer without leave to amend.' " (*Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 904.)

A court's denial of leave to amend is reviewable on appeal, " 'even in the absence of a request for leave to amend' [citations], and even if the plaintiff does not claim on appeal that the trial court abused its discretion in sustaining a demurrer without leave to amend." (*Aubry v. Tri-City Hospital Dist*., *supra*, 2 Cal.4th at p. 971; *Baldwin v. Marina City Properties, Inc*. (1978) 79 Cal.App.3d 393, 413–414; see Code Civ. Proc., § 472c, subd. (a) ["When any court makes an order sustaining a demurrer without leave to amend the question as to whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleadings was made."].)

Where a plaintiff has not been given a " 'fair prior opportunity' " to correct a substantive defect in a complaint, " '[l]iberality in permitting amendment is the rule' " even when the complaint is " 'deficient in substance.' " (*Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225, 1241.) If no leave has yet been requested, as is the case here, a plaintiff should be

permitted to amend a substantively deficient complaint if there is a reasonable probability the defect can be cured.[14]

As noted *ante,* the electricity users' tax is a debt owed to Torrance by electricity consumers within its boundaries. And pursuant to section 225.1.14, Torrance may assert its claim for unpaid taxes against any consumer that has underpaid its electricity user's tax due to Edison's incorrect tax base calculations. On remand, Torrance must be given the opportunity to amend its complaint to include those defendants as well as any other viable claims or defendants.

---

[14] Because we conclude that Torrance must be given leave to amend its complaint, we need not address Torrance's claim that the court erred by denying its motion for reconsideration.

## DISPOSITION

The judgment of dismissal is reversed. The court shall vacate its order sustaining Edison's demurrer without leave to amend and shall allow Torrance at least one opportunity to amend its complaint. The court shall resolve the declaratory relief claim, and conduct further proceedings, consistent with this opinion. Torrance shall recover its costs on appeal.

## TO BE PUBLISHED IN THE OFFICIAL REPORTS

LAVIN, Acting P. J.

WE CONCUR:

EGERTON, J.

SALTER, J.*

---

\* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.